**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| LICH THANH VU; and<br>LAN THUY NGUYEN VU, Personally,<br>and as the Guardian of<br>LICH THANH VU, | )<br>)<br>)<br>)<br>)    No. |
| Plaintiffs, | )    District Judge:<br>)    Magistrate Judge:<br>) |
| v. | )    CIVIL ACTION-LAW<br>)    JURY TRIAL DEMANDED |
| JOSEPH D. GIBSON,<br>CITY OF OKLAHOMA CITY, and<br>GENTNER F. DRUMMOND, | )<br>)<br>)<br>) |
| Defendants. | ) |

**COMPLAINT WITH JURY DEMAND**

**AND NOW** come the Plaintiffs, LICH THANH VU; and LAN THUY NGUYEN VU,

Personally, and as the Guardian of LICH THANH VU, by and through their counsel, DEVON M.

JACOB, ESQUIRE, of the law firm of JACOB LITIGATION, INC., to aver the following:

I.    **JURISDICTION AND VENUE**

1.    This action is brought pursuant to 42 U.S.C. § 1983.

2.    Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

3.    Pursuant to 28 U.S.C. § 1391, venue is proper in this Court, because the Defendants

are located within the Western District of Oklahoma, and the cause of action arose in the Western

District of Oklahoma.

II.    **IDENTIFICATION OF PARTIES**

4.    Plaintiff, LICH THANH VU ("LICH VU"), is an adult male, who during all

relevant times was a resident of Oklahoma City, Oklahoma.

1

5.      Plaintiff, LAN THUY NGUYEN VU ("LAN VU"), is an adult female, who during all relevant times was a resident of Oklahoma City, Oklahoma. LAN VU is the designated agent in a power of attorney ("POA") for LICH VU. The POA is a general POA that provides LAN VU with full authority with respect to the claims asserted herein. The POA was signed on November 15, 2024, and remains in effect. During all relevant times, LAN VU and LICH VU were, and continue to be, husband and wife.

6.      Defendant, JOSEPH D. GIBSON ("GIBSON"), is an adult male, who during all relevant times was employed by the Oklahoma City Police Department ("OKCPD"), as a police officer, with the rank of sergeant. GIBSON'S actions were taken under color of state law. He is sued in his individual capacity.

7.      Defendant, CITY OF OKLAHOMA CITY ("CITY"), is the 20th most populous and geographically the eighth largest city in the United States. CITY operates under a Council-Manager form of government, led by a Mayor, City Council, and City Manager. The City Council consists of a citywide elected Mayor and eight members elected by geographical areas called Wards. The City Council appoints a Manager to serve as the chief administrative officer overseeing CITY'S day-to-day operations. CITY operates with a $1.5 billion annual budget. CITY owns and operates the OKCPD. CITY'S principal place of business is 200 N. Walker Avenue, Oklahoma City, OK 73102.

8.      Defendant, GENTNER F. DRUMMOND ("DRUMMOND"), is an adult male, who during all relevant times was a resident of Oklahoma City, Oklahoma. DRUMMOND is the duly elected 20th Attorney General of the State of Oklahoma. DRUMMOND'S actions were taken under color of state law. He is sued in his individual capacity.

### III.    MATERIAL FACTS

### GIBSON Used Excessive Force Against LICH VU

9.      On October 27, 2024, JOSEPH D. GIBSON (GIBSON") was employed by the Oklahoma City Police Department ("OKCPD"), as a police officer, with the rank of sergeant.

10.     While on duty, GIBSON responded in a marked police vehicle, in full uniform, to the area of NW 39th Street and Amelia Avenue, Oklahoma City, OK 73112, to investigate a reported minor vehicle accident involving two vehicles.

11.     Upon arrival, GIBSON identified and spoke with LICH THANH VU (LICH VU"), an operator of one of the vehicles that had been involved in the accident.

12.     LICH VU is an elderly male, 71-years-old, approximately 5'4" tall, approximately 120 lbs., frail in appearance, and although not visibly readily apparent, in poor health.

13.     LICH VU speaks Vietnamese and "broken" English.

14.     GIBSON appears to be half of LICH VU's age, approximately 5'6" tall, approximately 195 lbs., and appears to be physically strong and in excellent physical condition.



15.     GIBSON did not believe that LICH VU possessed a weapon, and as such, did not pat him down for weapons.

16.     GIBSON did not believe that LICH VU presented as a physical threat to him or others, and as such, did not place him in handcuffs or otherwise restrict or control his movement.

17.     GIBSON decided that he would issue LICH VU a traffic citation.

18.     As a result of the language barrier, LICH VU became frustrated and upset about the traffic citation because he did not understand the factual and legal basis for same.

19.     So, when GIBSON asked LICH VU to place his signature on the citation, he declined to do so.

20.     Instead, LICH VU attempted to discuss the citation with GIBSON.

21.     Instead of deescalating the incident, GIBSON threatened to take LICH VU to jail if he continued to refuse to sign the citation.[1]

22.     Frustrated, LICH VU said "you shut up," while gesturing with his right hand – lightly tapping GIBSON on the outside of his bulletproof vest, a single time, with the back of his hand, between GIBSON'S belly and chest – as if to emphasize the "you" in his statement.

23.     LICH VU then immediately brought his right hand up to his own mouth gesturing with his index finger against his lips for GIBSON to be quiet, so that he could have an opportunity to speak without being interrupted.



---

[1] On November 18, 2024, the City Attorney declined to prosecute the traffic citation that was filed against LICH VU.

24.     The fact that LICH VU requested quiet was clear communication to GIBSON that LICH VU needed a moment to explain his confusion and to understand what was occurring.

25.     This fact is supported by a statement made by Officer Dakota R. Lewis in his police report, that at the hospital, LICH VU stated, "he did not want to sign the ticket at the scene since he did not understand the ticket and he has bad eyesight, so he could not read it well."

26.     While LICH VU said, "shut up," GIBSON should have understood that those words coming from a frustrated person of a different culture who is speaking broken English, should not be assumed to be a sign of disrespect, but rather, possibly the result of a limited vocabulary coupled with emotional upset.

27.     When LICH VU gestured, he was standing in a non-confrontational manner, perpendicular to GIBSON, with his right side facing GIBSON.

28.     GIBSON perceived LICH VU'S gesture as a hand gesture and not an attacking motion.

29.     This is evidenced by GIBSON'S admission in his police report that LICH VU "hit me with the back of his right hand on my chest, between my badge and body-worn camera. Lich then immediately put an index finger to his mouth telling me to shut up and 'shh.'"

30.     GIBSON should have recognized that the universal sign for quiet is not a threat of impending physical violence.

31.     LICH VU did not present as a physical threat to GIBSON or to any other person.

32.     LICH VU did not verbally threaten GIBSON or any other person.

33.     LICH VU did not attempt to flee GIBSON'S custody.

34.    In response to LICH VU'S comment and gesture, GIBSON said "no," and in apparent anger, grabbed LICH VU'S right wrist with his right hand, and his jacket near his left wrist with his left hand.

35.    GIBSON pulled LICH VU'S arms behind LICH VU'S back, and despite having complete physical control over LICH VU, instead of simply handcuffing him, he lifted LICH VU from the ground and slammed him face-first into the pavement using significant force.



36.    GIBSON'S body camera video of the use of force incident can be viewed at https://youtu.be/CCt9VxxAM5A and is incorporated herein by reference.

37.    The method used by GIBSON to take LICH VU to the ground deviated from standard law enforcement training regarding controlled take-down techniques.

38.    Standard controlled take-down techniques are designed to ensure the safety of both the officer and detainee.

39.    They do so by controlling the speed of the detainee's descent to the ground and the position in which they land, while maintaining control over the detainee.

40.    No exigency or legitimate law enforcement interest required GIBSON to take LICH VU to the ground in an uncontrolled manner that deviated from standard law enforcement training.

41.    With GIBSON holding LICH VU'S hands behind his back, LICH VU was defenseless and unable to break his fall or protect his face, head, or neck, from injury.

42.     When GIBSON slammed LICH VU'S head into the pavement, LICH VU lost consciousness and began to bleed from his head.

43.     Regardless, GIBSON handcuffed LICH VU behind his back, and left him handcuffed and on his stomach for approximately two and a half minutes.

### GIBSON Threatened to Pepper Spray LAN VU When She Came to LICH VU'S Aid and Attempted to Photograph His Injuries

44.     When LAN VU saw that LICH VU was suffering from a medical emergency, she approached GIBSON and stated that an ambulance needed to be called.

45.     Once LAN VU confirmed that GIBSON had summoned an ambulance, LAN VU stated that she wanted to take a picture of LICH VU'S injuries and attempted to do so.

46.     Upon seeing LAN VU with her phone in her hand and attempting to photograph LICH VU'S injuries, GIBSON grabbed LAN VU by her right arm, pulled her away from LICH VU, and then pushed her further away.

47.     When LAN VU again attempted to take a picture from a distance, GIBSON ordered her to move away and threatened to pepper spray her if she did not do so.

48.     At no time did LAN VU present as a threat to GIBSON, and it is clear from GIBSON'S actions in not patting her down, handcuffing her, or otherwise restricting her movement, that GIBSON did not perceive her to be a threat.

49.     LAN VU'S attempts to document LICH VU'S injuries did not interfere with GIBSON'S exercise of his police power, because other than to check for a pulse, GIBSON took no action to either assess LICH VU'S injuries, to provide him with emergency medical care, or to comfort him.

### Officer Dakota R. Lewis Assists GIBSON

50.     Officer Dakota R. Lewis arrived on scene to assist GIBSON.

51.    GIBSON told Lewis that "he hit his head."

52.    Lewis rolled LICH VU onto his right side and began to monitor his medical condition.

53.    Lewis stated in his police report that "I rolled the unresponsive male, Mr Lich Vu, on his right side to place him more in a recovery position to better help his breathing[.]"

54.    LICH VU remained unconscious for at least five minutes.

55.    When LICH VU began to regain consciousness, he communicated to Lewis that he was confused and in pain.

### GIBSON Told Medical Personnel that LICH VU "Fell"

56.    Medically trained first responders are responsible for relaying relevant medical information to nurses and doctors.

57.    Knowing the mechanism of injury assists first responders, nurses, and doctors, in diagnosing an injury and in determining the necessary and appropriate medical care to be provided.

58.    However, when asked by ambulance personnel what happened, GIBSON did not state what he knew to be the truth, i.e., that he lifted LICH VU from his feet and intentionally slammed him headfirst into the pavement.

59.    Instead, GIBSON stated, "I grabbed ahold of him. He fell. He hit his head whenever he fell. Pretty hard."

### LICH VU Suffered Serious and Life-threatening Injuries

60.    As a direct result of the force used by GIBSON, LICH VU suffered serious and life-threatening injuries, including but not limited to the following:

a.    Mixed density subdural hematoma overlying the left cerebral convexity with acute subdural hemorrhage overlying the anterior falx with apparent hypoattenuating right subdural collection.

b.    Acute, nondisplaced fractures to the left frontal bone extending in the left superior orbital wall. Left preseptal edema as well as a small amount of extraconal blood products and resultant mild proptosis of the left globe.

c.    Large hematoma/laceration over the left frontal region as well as left preseptal swelling.

d.    An acute, nondisplaced fracture of the anterior wall of the left maxilla that may extend through the left maxillary sinus or the posterior portion.

e.    Acute displaced fracture of the posterior arch of C1 bilaterally as well as the anterior arch bilaterally.

61.    On November 8, 2024, LICH VU underwent bilateral middle meningeal artery (MMA) embolization.

62.    LICH VU remained hospitalized for several weeks.

63.    As a direct result of the force used by GIBSON against him, LICH VU suffered a permanent cognitive decline.

**GIBSON Made Several False Reports to Law Enforcement[2,3]**

64.    GIBSON was conscious of his body camera, as evidenced by his turning it off before he spoke to Gary.

---

[2] "Any person who willfully delays or obstructs any public officer in the discharge or attempt to discharge any duty of his or her office[.]." 21 OK Stat § 540 (2024).

[3] "It shall be unlawful to willfully, knowingly and without probable cause make a false report to any person of any crime or circumstances indicating the possibility of crime having been committed . . . which report causes or encourages the exercise of police action or investigation." 21 OK Stat § 589 (2024).

65.    From prior use, GIBSON knew that because his body camera was affixed to the front of his uniform, it could not capture and record things that occur on his uniform in the same location.

66.    As such, GIBSON knew that whether LICH VU had touched, hit, or grabbed him, would not have been recorded by his body camera.

67.    Moreover, GIBSON knew from past experience that due to his body's movements and his close proximity to LICH VU, his body camera would not have been able to capture and record his use of force against LICH VU.

68.    As such, GIBSON would have assumed that regarding what had occurred, it would be his word against LICH VU'S word.

69.    GIBSON apparently told Lewis that LICH VU had fallen, because in his police report, Lewis stated, "Mr Vu also has a small list of prior-existing medical conditions which likely played a part in Mr Vu falling down at the scene."

70.    Lewis further stated in his police report, "Gibson signed a ticket against Mr Vu for Assault and Battery."

71.    The ticket that GIBSON signed charging LICH VU with Assault and Battery, provides in relevant part, "I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true."[4]

72.    Before LICH VU was transported by ambulance from the scene, Lt. David B. Gary arrived on scene and asked GIBSON, "what happened?"

---

[4] While ticket 20-123168X was issued to LICH VU alleging a violation of municipal code chapter 30-17 subsection AB2, when the Municipal Court of the City of Oklahoma Court could not find a record of the ticket having been filed, the Court investigated and discovered that the ticket had been voided and not filed with the Court.

73.    GIBSON stated, "talking to Lt. Gary, turning body camera off," and then turned off his body camera.

74.    Inexplicably, OKCPD's policy manual directs officers to turn off their body camera "During a conversation with any supervisor or investigator to discuss details of an incident." OKCPD Policy 4-201.2.

75.    What GIBSON did not know at the time was that a security camera owned by a nearby business was also recording his actions at the scene.

76.    The security camera video of the use of force incident can be viewed at https://youtu.be/OuVlCLrqxd0 and is incorporated herein by reference.

77.    On the security video, GIBSON can be seen grabbing Gary's bullet proof vest with his left hand, twice, while facing Gary; presumably indicating to Gary that LICH VU had done the same to him.

78.    In his police report, GIBSON stated three times that LICH VU had merely fallen while he had attempted to handcuff him:

> While I was holding onto Lich's arms he was pulling away from me with both arms and both of his hands were behind his back. Lich began leaning to the left. I pulled on Lich's arm and he **fell** to the ground. While Lich was **falling**, I instructed get on the ground, knowing that Lich was going to the ground. While he was **falling** his face was parallel to the ground. Lich's forehead hit the ground.

**Use of Force Policy and Training: Oklahoma Attorney General,**
**GENTNER DRUMMOND: _De Facto_ Policymaker and Supervisor of CITY and OKCPD[5]**

79.    Oklahoma Attorney General, GENTNER DRUMMOND ("DRUMMOND"), is the top law enforcement officer for the State of Oklahoma, and thus a policymaker for the State of Oklahoma.

---

[5] "Any peace officer . . . who uses excessive force in pursuance of such officer's law enforcement duties shall be subject to the criminal laws of this state to the same degree as any other citizen[.]" 22 OK Stat § 34.1 (2024).

80.    The State of Oklahoma sets the mandated training curriculum for police officers in the State.

81.    DRUMMOND had the duty and policymaking authority to ensure that police officers' training adhered to state and federal law.

82.    On October 30, 2024, just three days after GIBSON used excessive force against LICH VU, DRUMMOND issued Attorney General Opinion 2024-15, discussing the fact that House Bill 2537's amendments to section 34.1(A) of title 22 should not be construed to prohibit the prosecution of peace officers who utilize excessive force, stating,

> Since its enactment in 1992, section 34.1 of title 22 of the Oklahoma Statutes has subjected peace officers using excessive force while performing their law enforcement duties to the criminal laws of this state. Until 2023, peace officers could ostensibly be convicted for using force that violated only their law enforcement agency's internal policies and guidelines. At least theoretically, this created the anomalous situation where, for example, an Oklahoma City police officer who used a certain degree of force may have committed a crime while a Tulsa police officer who used the identical amount of force under precisely the same circumstances, would not have committed a crime if their respective department's policies differed.

> Enter House Bill 2537 in 2023. Passed with significant support in both chambers, House Bill 2537 eliminated the reference to internal policies and guidelines as a basis for prosecuting a peace officer for using excessive force. Now, a peace officer cannot be charged and tried for violating his or her law enforcement agency's policies and guidelines. All peace officers in Oklahoma accused of utilizing excessive force are now judged using the same test: Was the force reasonably necessary under the circumstances at the time that the peace officer used force? 22 O.S.Supp.2023, § 34.1(B).

83.    In December of 2024, with the authorization of Oklahoma County District Attorney, Vicki Behenna, GIBSON was criminally charged with Aggravated Assault and Battery (Okla. Stat. tit. 21 § 646), a felony.

84.    The Attorney General for the State of Oklahoma has statutory authority pursuant to Title 74, Section 18b(A)(3) to prosecute or assist in cases when requested by the governor or a district attorney, or when deemed necessary for the public interest.

85.    On December 23, 2024, DRUMMOND entered his appearance in the GIBSON criminal matter.

86.    On December 27, 2024, DRUMMOND dismissed the Aggravated Assault and Battery charge filed against GIBSON stating, "I will not permit Oklahoma police officers to face criminal prosecution for conduct adhering to their training."

87.    Notably, despite explaining in Attorney General Opinion 2024-15 that under revised Oklahoma law, police officers were to be judged by the same legal standard as all citizens, DRUMMOND carved out an immunity exception for police officers only, i.e., if the police officer was following training that authorized the force used.

88.    DRUMMOND'S decision to end the criminal prosecution against GIBSON after he personally decided that GIBSON'S conduct did not constitute an unlawful use of force, is clear evidence that he alone – not use of force experts, juries, criminal courts, or the legislature – is the sole and final decisionmaker regarding *what* constitutes excessive force in the State of Oklahoma.

89.    As the only person with such authority, with respect to use of force policy and training, DRUMMOND is a *de facto* policymaker and supervisor for the CITY and OKCPD

90.    DRUMMOND'S declaration that GIBSON'S use of force adhered to police training, evidences prior knowledge of the issue and intentional decision making in setting the policy and training before GIBSON used excessive force in accordance with same.

91.    DRUMMOND'S declaration that GIBSON'S use of force adhered to police training, set and ratified the use of force policy and training for the OKCPD.[6]

**OKCPD Had Notice of De-escalation and Take-Down Issues**

92.    In 2021, OKCPD issued a statement regarding an August of 2020 use of force incident involving three police officers and a 74-year-old woman wherein the woman claimed that officers unlawfully entered her home and broke her arm.

93.    The statement provided in relevant part, "Upon review of the incident and the [body camera] footage, it was determined that the responding officers should have made greater efforts to de-escalate the situation prior to resorting to use of force. Corrective action to include discipline and training has been taken to help ensure that future calls like this one are handled in a more appropriate manner."

94.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

        a.    Despite being placed on notice of a training deficiency that caused three officers to fail to properly deescalate an incident involving an elderly person that resulted in a use of force that caused significant injury, corrective training was provided only to the involved police officers and not to all OKCPD police officers.

95.    In November of 2020, instead of deescalating, five OKCPD police officers shot and killed a 15-year-old boy after a botched robbery after he had surrendered and relinquished his weapon.

---

[6] Oklahoma City Fraternal Order of Police Lodge 123 issued a statement confirming that GIBSON "was following his training" when he used force against LICH VU.

14

96.     In August of 2021, instead of deescalating, an OKCPD police officer used force to take a 44-year-old man who was suffering from a medical emergency to the ground who had his hands up when the officer encountered him.

97.     During the takedown, the police officer broke the man's arm and fractured his hip.

98.     In December of 2021, instead of deescalating, an OKCPD police officer fatally shot a 60-year-old man in the back who was running away from the officer with a knife.

### CITY Retains Expert: 21CP Solutions: Additional Notice Provided

99.     The CITY contracted 21CP Solutions to: "engage[], analy[ze], and form[]recommendations regarding specific law enforcement practices and related topics," "to provide reports to the Mayor's Task Force, the Oklahoma City Working Group, and the City Council of Oklahoma City summarizing the analysis of existing community and police department conditions, describing the analysis of best practices conducted, and making recommendations for best practices to be adopted by the City of Oklahoma City," in relation to certain matters, including "Law Enforcement De-escalation Policy."

100.     In November of 2021, 21CP Solutions issued its report and recommendations.[7]

101.     In its report, 21CP Solutions stated, "there are often critical differences among what a department *says* that it does, what it *actually does*, and what it *should do*."

102.     The report noted that "community members . . . said that they do not believe there is a culture in OKCPD that values the sanctity of life or engages in harm reduction in every interaction, especially in BIPOC or marginalized communities."

103.     The report noted, "Additionally, concerns about racially disparate treatment from all communities of color were inseparable with comments about the need for de-escalation."

---

[7] https://www.okc.gov/home/showpublisheddocument/27148

104.    Regarding De-escalation, the report noted in relevant part, the following:

*****

The OKC Operations Manual is divided into Policies, Procedures, and Rules.

*****

"This form of guidance to officers is needlessly complex and contributes to the reason for the Department's six-hundred- and twenty-six-page Operations Manual. In practice, the distinctions between Policies, Procedures, and Rules appear muddy, with granular issues such as uniforms and restrictions on Secondary Employment placed at the Policy level. In contrast, de-escalation appears as a Procedure.

*****

Although 21CP recommends globally that the Operations Manual be collapsed into clear policies that incorporate the value, purpose, and procedures on how to follow any given policy, at the very least de-escalation should be included as a core principle and value, which it is not. While functionally this may not matter as officers are accountable to all aspects of the Operations Manual, clearly designating de-escalation as the centerpiece of police engagements at the highest tier of standards under the Policy Manual sends a strong departmental signal, both internally and externally.

*****

De-escalation should be elevated to the policy level to highlight it as a core department value.

*****

### **United States Department of Justice Civil Rights Division**

105.    On January 3, 2025, the United States Department of Justice Civil Rights Division ("DOJ") issued a report "Investigation of Oklahoma, Oklahoma City, and Oklahoma City Police Department.[8]

106.    In its report, the DOJ concluded that the CITY and OKCPD are violating the Title II of the Americans with Disabilities Act (ADA) and the pattern or practice provision of the Violent Crime Control and Law Enforcement Act of 1994.

---

[8] https://www.justice.gov/crt/media/1382351/dl

107.    While focused on one subset of use of force incidents – use of force incidents involving behavioral health between June 2022 and January 2024 – the DOJ concluded in relevant part,

> In many of the incidents we reviewed, officers knew or should have known the person had a disability and could have safely made reasonable modifications to resolve the encounter peacefully. These modifications include calling for assistance from behavioral health professionals, giving the person more time and space to comply with commands, using active listening, communicating clearly, speaking in a calm tone, and using other well-established deescalation techniques. Instead, we saw officers escalate encounters or use unreasonable tactics, which sometimes led to using unnecessary and avoidable force. This occurred in incidents where the person was not threatening anyone's safety, had not committed a crime, and needed help. The City and OKCPD's failure to make reasonable modifications denies people with behavioral health disabilities an equal opportunity to access and benefit from its emergency response system.
>
> ******************
>
> Officers also escalated encounters with people showing symptoms of behavioral health disabilities when they could have safely and reasonably used well-known deescalation tactics, such as approaching the person slowly, clearly identifying oneself, and giving time to comply.
>
> ******************
>
> In other instances, OKCPD officers used appropriate deescalation tactics, but after a short period of time, abruptly and unnecessarily escalated the incident by using force.
>
> ******************
>
> But problems with supervision have contributed to officers' failure to modify their conduct. Each time an officer reports using force, supervisors review whether the force was justified and whether officers used appropriate deescalation. In our review, however, OKCPD's chain of command rarely made use of this as an opportunity to help officers improve their conduct. Instead, OKCPD nearly universally validated uses of force against people in crisis and approved the officer's deescalation, even when officers behaved aggressively and failed to make reasonable modifications. We also note that we observed several unreported uses of force in our random sample—suggesting there are some uses of force that escape review altogether.

IV.     **LEGAL CLAIMS**[9]

**COUNT I**

**LICH VU v. GIBSON**
**Fourth Amendment (Excessive Force)**
*Pursuant to 42 U.S.C. § 1983*

108.    Paragraphs 1 to 107 are incorporated herein by reference.

109.    Claims that law enforcement officers used excessive force are analyzed under the

Fourth Amendment to the Federal Constitution's objective reasonableness standard. *See Graham*

*v. Connor,* 490 U.S. 386, 388 (1989).

110.    To state a claim for excessive force under the Fourth Amendment, a Plaintiff must

show that a seizure occurred and that it was objectively unreasonable.

111.    The test of Fourth Amendment reasonableness of force used during a seizure is

whether, under the totality of the circumstances, a law enforcement officer's actions are objectively

reasonable in light of facts and circumstances confronting him, without regard to his underlying

intent or motivations. *See Graham,* 490 U.S. at 397.

112.    LICH VU'S gesture presented as a hand gesture and not an attacking motion.

113.    LICH VU did not present as a physical threat to GIBSON or any other person.

114.    LICH VU did not verbally threaten GIBSON or any other person.

115.    LICH VU did not attempt to flee GIBSON'S custody.

116.    GIBSON pulled LICH VU'S arms behind LICH VU'S back, and despite having

complete physical control over LICH VU, instead of simply handcuffing him, he lifted him from

---

[9] In a Complaint, a Plaintiff is only required to plead facts, not legal theories. *See Johnson v. City of Shelby,* 574 U.S. 10 (2014) (Per Curiam) (reversing Fifth Circuit and holding that only facts need to be pled in a complaint, not legal theories). Plaintiff is only required to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U. S. 544, 569-70 (2007); *Ashcroft v. Iqbal,* 556 U. S. 662 (2009). Plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P 8(a)(2). "Each allegation must be simple, concise, and direct. No technical form is required." FED.R.CIV.P. 8(d)(1).

the ground, and then slammed him face-first into the pavement using significant force.

117.    The method used by GIBSON to take LICH VU to the ground deviated from standard law enforcement training regarding controlled take-down techniques designed to ensure the safety of both the officer and detainee by controlling the speed of the detainee's descent to the ground, and the position in which they land.

118.    No exigency or legitimate law enforcement interest required GIBSON to take LICH VU to the ground in an uncontrolled manner that deviated from the standard law enforcement training.

119.    When GIBSON used force against LICH VU, he was not acting in self-defense or in the defense of others.

120.    With GIBSON holding LICH VU'S hands behind his back, LICH VU was defenseless and unable to break his fall or protect his face, head, or neck, from injury.

121.    The force used by GIBSON against LICH VU was objectively unreasonable.

122.    As a direct and proximate result of GIBSON'S conduct, LICH VU suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and loss of consortium.

## COUNT II

### LICH VU v. DRUMMOND
### Fourth and Fourteenth Amendments (Supervisor Liability)
### *Pursuant to 42 U.S.C. § 1983*

123.    Paragraphs 1 to 107 are incorporated herein by reference.

124.    To establish supervisory liability under § 1983, a Plaintiff must establish that: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to people like the Plaintiff;

(2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the Plaintiff.

125.    GIBSON used excessive force against LICH VU in violation of the Fourth Amendment to the Federal Constitution.

126.    Oklahoma Attorney General, GENTNER DRUMMOND, is the top law enforcement officer for the State of Oklahoma, and thus a policymaker for the State of Oklahoma.

127.    In his capacity as the top law enforcement officer for the State of Oklahoma, DRUMMOND acted in the capacity of a supervisor over all law enforcement officers operating in the State.

128.    The State of Oklahoma sets the mandated training curriculum for police officers in the State.

129.    DRUMMOND had the duty and policymaking authority to ensure that police officers' training adhered to state and federal law.

130.    The Attorney General for the State of Oklahoma has statutory authority pursuant to Title 74, Section 18b(A)(3) to prosecute or assist in cases when requested by the governor or a district attorney, or when deemed necessary for the public interest.

131.    On October 30, 2024, just three days after GIBSON'S use of excessive force against LICH VU, DRUMMOND issued Attorney General Opinion 2024-15, discussing the fact that House Bill 2537's amendments to section 34.1(A) of title 22 should not be construed to prohibit the prosecution of peace officers who utilize excessive force.

132.    On December 23, 2024, DRUMMOND entered his appearance in the GIBSON criminal matter.

133.    On December 27, 2024, DRUMMOND dismissed the Aggravated Assault and Battery charge filed against GIBSON stating, "I will not permit Oklahoma police officers to face criminal prosecution for conduct adhering to their training."

134.    DRUMMOND'S decision to end the criminal prosecution against GIBSON after he personally decided that GIBSON'S conduct did not constitute an unlawful use of force, is clear evidence that he alone – not use of force experts, juries, criminal courts, or the legislature – is the sole and final decisionmaker regarding *what* constitutes unlawful force in the State of Oklahoma.

135.    As the only person with such authority, with respect to use of force policy and training, DRUMMOND is a *de facto* policymaker and supervisor for the CITY and OKCPD

136.    DRUMMOND'S declaration that GIBSON'S use of force adhered to police training, evidences prior knowledge of the issue and intentional decision making in setting the policy and training before GIBSON used excessive force in accordance with same.

137.    DRUMMOND'S declaration that GIBSON'S use of force adhered to police training, set and ratified the use of force policy and training for the OKCPD that GIBSON followed.

138.    As a direct and proximate result of DRUMMOND'S conduct, LICH VU suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and loss of consortium.

## COUNT III

**LICH VU v. CITY**
**Fourth and Fourteenth Amendments (Monell)**
***Pursuant to 42 U.S.C. § 1983***

139.    Paragraphs 1 to 107 are incorporated herein by reference.

140.    "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978).

141.    A failure to train can constitute deliberate indifference if "the municipality has failed to act 'in response to repeated complaints of constitutional violations by its officers,'" *Ouza v. City of Dearborn Heights,* 969 F.3d 265, 287 (6th Cir. 2020) (*quoting Cherrington v. Skeeter,* 344 F.3d 631, 646 (6th Cir. 2003)), or where the need for more training was "obvious." *See Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 409 (1997); *City of Canton v. Harris,* 489 U.S. 378, 390 (1989).

142.    During all relevant times, GIBSON acted under the color of state law as an employee of CITY.

143.    During all relevant times, GIBSON acted pursuant to the policies and training of CITY or the lack thereof.

144.    CITY was on notice that its police officers were failing to de-escalate incidents, using excessive force during the process of handcuffing, using non-sanctioned takedown methods, and injuring persons, and specifically, the elderly.

145.    Despite this notice, CITY did not take action to correct these issues departmentwide.

146.    As a direct result of CITY'S policy and training deficiencies, GIBSON escalated instead of de-escalated the incident with LICH VU.

147.    As a direct result of CITY'S policy and training deficiencies, GIBSON took LICH VU to the ground using a method that deviated from standard law enforcement training regarding controlled take-down techniques.

148.    As a direct and proximate result of CITY'S conduct, LICH VU suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and loss of consortium.

## COUNT IV

### LICH VU v. GIBSON
### Excessive Force
### *(Pursuant to Oklahoma Constitution, art. 2, § 30)*

149.    Paragraphs 1 to 107 are incorporated herein by reference.

150.    Article II, Section 30, of the Constitution of the State of Oklahoma protects citizens from unreasonable searches and seizures. *See Okla. Const. art 2, §30.*

151.    LICH VU'S gesture presented as a hand gesture and not an attacking motion.

152.    LICH VU did not present as a physical threat to GIBSON or any other person.

153.    LICH VU did not verbally threaten GIBSON or any other person.

154.    LICH VU did not attempt to flee GIBSON'S custody.

155.    GIBSON pulled LICH VU'S arms behind LICH VU'S back, and despite having complete physical control over LICH VU, instead of simply handcuffing him, he lifted him from the ground and slammed him face-first into the pavement using significant force.

156.    The method used by GIBSON to take LICH VU to the ground deviated from standard law enforcement training regarding controlled take-down techniques designed to ensure

the safety of both the officer and detainee by controlling the speed of the detainee's descent to the ground, and the position in which they land.

157.    No exigency or legitimate law enforcement interest required GIBSON to take LICH VU to the ground in an uncontrolled manner that deviated from the standard law enforcement training.

158.    When GIBSON used force against LICH VU, he was not acting in self-defense or in the defense of others.

159.    With GIBSON holding LICH VU'S hands behind his back, LICH VU was defenseless, unable to break his fall or protect his face, head, or neck, from injury.

160.    The force used by GIBSON against LICH VU was objectively unreasonable.

161.    As a direct and proximate result of GIBSON'S conduct, LICH VU suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and loss of consortium.

## COUNT V

### LICH VU v. DRUMMOND
### Excessive Force
### *(Pursuant to Oklahoma Constitution, art. 2, § 30)*

162.    Paragraphs 1 to 107 are incorporated herein by reference.

163.    GIBSON used excessive force against LICH VU in violation of Article II, Section 30, of the Constitution of the State of Oklahoma.

164.    DRUMMOND is the top law enforcement officer for the State of Oklahoma, and thus a policymaker for the State of Oklahoma.

165.    The State of Oklahoma sets the mandated training curriculum for police officers in the State.

24

166.    As Attorney General and the top law enforcement officer in the State of Oklahoma, DRUMMOND had the duty and policymaking authority to ensure that police officers' training adhered to state and federal law.

167.    DRUMMOND dismissed the Aggravated Assault and Battery charge filed against GIBSON stating, "I will not permit Oklahoma police officers to face criminal prosecution for conduct adhering to their training."

168.    DRUMMOND admitted that GIBSON'S use of force adhered to the training program for police officers in the State of Oklahoma – a policy/program that he set and/or permitted to continue.

169.    DRUMMOND ratified GIBSON'S unlawful use of force when he admitted that GIBSON'S use of force adhered to the training program for police officers in the State of Oklahoma.

170.    DRUMMOND'S ability to end the criminal prosecution against GIBSON further evidences his final policymaking authority with respect to the issue of what constitutes a lawful use of force by police officers in the State of Oklahoma.

171.    As the only person with such authority, with respect to use of force policy and training, DRUMMOND is a *de facto* policymaker and supervisor for the CITY and OKCPD

172.    DRUMMOND'S declaration that GIBSON'S use of force adhered to police training, evidences prior knowledge of the issue and intentional decision making in setting the policy and training before GIBSON used excessive force in accordance with same.

173.    DRUMMOND'S declaration that GIBSON'S use of force adhered to police training despite the conclusion by OKCPD De-escalation Control and Defensive Tactics

25

Instructors' conclusion that it did not, set and ratified the use of force policy and training for the OKCPD.

174.    As a direct and proximate result of DRUMMOND'S conduct, LICH VU suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and loss of consortium.

## COUNT VI

### LICH VU v. GIBSON
### Assault and Battery
### *(Pursuant to Oklahoma State Law)*

175.    Paragraphs 1 to 107 are incorporated herein by reference.

176.    GIBSON'S use of excessive force against LICH VU constitutes assault and battery.

177.    As a direct and proximate result of GIBSON'S conduct, LICH VU suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and loss of consortium.

## COUNT VII

### Plaintiffs v. GIBSON
### Intentional Infliction of Mental Anguish and Emotional Distress
### *(Pursuant to Oklahoma State Law)*

178.    Paragraphs 1 to 107 are incorporated herein by reference.

179.    GIBSON intentionally caused LICH VU to suffer mental anguish and emotional distress when he intentionally used excessive force against him.

180.    GIBSON intentionally caused LAN VU to suffer mental anguish and emotional distress when he intentionally used excessive force against LICH VU in her presence.

181.    As a direct and proximate result of GIBSON'S conduct, Plaintiffs suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, and/or loss of

consortium.

## COUNT VIII

**Plaintiffs v. GIBSON**
**Loss of Consortium**
*(Pursuant to Oklahoma State Law)*

182.    Paragraphs 1 to 107 are incorporated herein by reference.

183.    LAN VU and LICH VU are husband and wife.

184.    GIBSON'S use of excessive force against LICH VU in violation of Oklahoma State Law, caused LICH VU to suffer physical injury that resulted in Plaintiffs suffering a loss of consortium.

185.    As a direct and proximate result of GIBSON'S conduct, Plaintiffs suffered a loss of consortium.

## COUNT IX

**Plaintiffs v. CITY**
**Respondeat Superior**
*(Pursuant to Oklahoma State Law)*

186.    Paragraphs 1 to 107 are incorporated herein by reference.

187.    Article II, Section 30, of the Constitution of the State of Oklahoma protects citizens from unreasonable searches and seizures. *See Okla. Const. art 2, §30.*

188.    The OKC owns and operates the OKCPD.

189.    GIBSON is an employee of the OKCPD.

190.    When GIBSON used excessive force against LICH VU, he was acting in the course and scope of his employment.

191.    GIBSON'S use of force occurred incident to his employer's business, while GIBSON was performing law enforcement services on behalf of his employer, and while

attempting to conduct his employer's business.

192.    Moreover, as DRUMMOND confirmed, GIBSON'S use of force adhered to the law enforcement training provided by or required by his employer.

193.    As such, the CITY is liable for GIBSON'S violations of *state law* committed against Plaintiffs.

194.    As a direct and proximate result of GIBSON'S conduct, Plaintiffs suffered embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and/or loss of consortium.

**V.    REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor as follows:

A.    **Declaratory Judgment:** Providing that the Defendants' conduct violated the Plaintiffs' state and federal rights as alleged;

B.    **Compensatory Damages:** Including, but not limited to, the monetary value associated with the following: violations of legal rights, embarrassment, humiliation, physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and loss of consortium, as alleged;

C.    **Punitive damages** as permitted by law;

D.    **Equitable Relief:** An admission of the allegations stated in the Complaint or any Amended Complaint, in writing, and an oral and written apology for same, in person, from the Defendants;

E.    **Attorney's Fees and Costs** as permitted by law; and

F.    **Discretionary Damages and Relief:** Such other financial or equitable relief that

the Court deems reasonable and just.

## VI.    <u>JURY TRIAL DEMAND</u>

Plaintiffs respectfully request a trial by jury on all claims/issues in this matter that may be

tried to a jury.


**Respectfully Submitted,**


*Devon M. Jacob*

_____                    **Date: April 14, 2025**

**DEVON M. JACOB, ESQUIRE**
PA Bar Number: 89182
**JACOB LITIGATION, INC.**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com

*Plaintiffs' Counsel*